FILED IN OPEN COURT
U.S.D.C. Atlanta

JUL - 5 2016

James N. Hatten, Clerk
By: _____
      Deputy Clerk



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES J. ACREE | NO. 1:16-CR-232 |

### CRIMINAL INFORMATION

The United States Attorney charges that:

1. From in or about February 2007 through in or about November 2013, in the Northern District of Georgia and elsewhere, the defendant,

JAMES J. ACREE,

knowingly and willfully combined, conspired, confederated, agreed, and had a tacit understanding with James G. Maloney ("Maloney") and James D. Fraley, III ("Fraley") to commit mail fraud and wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, defendant ACREE and his co-conspirators, for the purpose of executing such scheme and artifice, knowingly caused certain matters and things to be delivered by mail and by private and commercial interstate carrier, according to the directions thereon, in violation of the mail fraud statute, Title 18,

United States Code, Section 1341, and knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, in violation of the wire fraud statute, Title 18, United States Code, Section 1343.

## Background

2. At all times relevant to this Criminal Information, defendant ACREE and his co-conspirators were employed by the Georgia Institute of Technology ("Georgia Tech") and were members of the research faculty at the Georgia Tech Research Institute ("GTRI") in Atlanta, Georgia.

3. Defendant ACREE and his co-conspirators are experts in electromagnetic analysis and measurements and were assigned to GTRI's Advanced Concepts Laboratory, where they worked on projects funded by the United States Department of Defense, various intelligence agencies, and private industry.

4. One of the projects that Maloney and Fraley worked on at GTRI, which was funded by the United States, was known as contract D6308.

5. Maloney was the Project Director on D6308 and was responsible for all charges billed to that contract during the time he worked at GTRI.

## Object of the Conspiracy

6. The object of the conspiracy was for defendant ACREE and his co-conspirators to unjustly and unlawfully enrich themselves at the expense of the United States and Georgia Tech.

7. Defendant ACREE and his co-conspirators sought to accomplish the object of the conspiracy in two ways: by using a Georgia Tech corporate purchasing card (also known as a "PCard") to pay for personal expenses; and by engaging in fraudulent consulting activity.

## PCard Fraud

8. As part of his duties and responsibilities at GTRI, Fraley was allowed to use a Georgia Tech PCard to purchase materials and supplies for official Georgia Tech business purposes.

9. Fraley's Georgia Tech PCard was issued by Bank of America. Approximately every 30 days, Bank of America mailed an account statement to Fraley, listing all new charges on the account. Fraley was required to provide documentation to Georgia Tech to justify each charge on the account.

10. Defendant ACREE and his co-conspirators were not allowed to use a Georgia Tech PCard to pay for personal expenses.

11. Defendant ACREE and his co-conspirators charged more than $250,000 worth of personal expenses to Fraley's Georgia Tech PCard, including two four-wheelers and a trailer, two Sony 52-inch flat-screen televisions, Apple computers, iPads, OtterBox protective cases, iPods, Kindle E-readers (some with lighted leather covers), Leica and Nikon digital cameras, video cameras, a mini micro pinhole video camcorder pen, a night vision monocular, two pairs of binoculars, Bose headphones, a 3D printer, sports watches with heart-rate monitors, sunglasses, materials used to perform private consulting contracts, computer monitors and solar panels for a private hunting club, a personal video network for home use, and an uninterruptible power supply for a tennis ball machine. Defendant ACREE and his co-conspirators purchased some of these items online through Amazon.com and others from the Georgia Tech bookstore. These purchases generated interstate wire communications, and the items purchased online were delivered by mail and by private and commercial interstate carrier.

12. At all times relevant to this Criminal Information, Fraley and Maloney owned a Georgia corporation called J's Services, Inc.

13. Fraley and Maloney used Fraley's Georgia Tech PCard to pay for remodeling and maintenance expenses related to six rental properties owned by J's Services.

14. Maloney caused payments for the benefit of J's Services to be charged to the United States on contract D6308, even though Maloney knew and had reason to know that such payments were not related to D6308.

15. Fraley also used his Georgia Tech PCard to make PayPal payments to friends and relatives who "kicked back" some of the money to him.

16. To make their personal PCard charges look like legitimate Georgia Tech business expenses, defendant ACREE and his co-conspirators provided and caused others to provide false information and fraudulent documents to Georgia Tech and the United States.

17. In or about June 2013 — after defendant ACREE and his co-conspirators learned that they were being investigated by Georgia Tech's Internal Auditing Department — Maloney attempted to delete from Fraley's cell phone incriminating text messages concerning the PCard fraud.

18. In or about July 2013, defendant ACREE and his co-conspirators met to discuss their PCard fraud, get their stories straight, and plan a cover-up. Fraley recorded these conversations on his phone and later turned the recordings over to the FBI.

19. Maloney then gathered up many of the items he had acquired through the PCard fraud, took them to his office at GTRI, and left them there to make it appear that they had been purchased for official Georgia Tech business purposes rather than for his personal use.

## Fraudulent Consulting Activity

20. In or about February 2007, defendant ACREE and Maloney were reprimanded by GTRI for engaging in outside consulting activity that violated Georgia Tech's conflict-of-interest policy.

21. In response, on or about February 22, 2007, defendant ACREE and Maloney sent a letter to their supervisor at GTRI, acknowledging that they had used facilities and equipment owned by Georgia Tech for their own personal gain and benefit.

22. In that letter, defendant ACREE and Maloney also said:

> We deeply regret our failure to properly report this consulting activity in a timely fashion. . . . All parties understand that this is unacceptable . . . . No further consulting arrangements are in-play or under consideration. . . . This activity was initiated without the consent or prior knowledge of GTRI . . . , and we understand that this was contrary to policy. We truly regret any potential harm this may cause to the image of GTRI . . . and won't let this happen again in the future.

23. Nevertheless, defendant ACREE and Maloney continued to engage in outside consulting activity that harmed Georgia Tech, and they were soon joined by Fraley.

24. Beginning in or about December 2007, and continuing through at least in or about March 2013, defendant ACREE and his co-conspirators moonlighted as consultants for Picatinny Arsenal, SRA International, and the U.S. Air Force, while they were employed by Georgia Tech.

25. Defendant ACREE and his co-conspirators were paid a combined total of approximately $500,000 for the consulting work they did for Picatinny Arsenal, SRA International, and the U.S. Air Force.

26. Defendant ACREE and his co-conspirators obtained this outside consulting work from Picatinny Arsenal, SRA International, and the U.S. Air Force by falsely leading the customers to believe that the work would be done by GTRI. Defendant ACREE and his co-conspirators furthered this false impression by using their official GTRI telephone numbers and GTRI email addresses in their communications with the customers. In addition, defendant ACREE and his co-conspirators met with these customers at GTRI's headquarters on the Georgia Tech campus and gave the customers tours of GTRI's labs and other facilities. At no time did defendant ACREE or his co-conspirators reveal to the customers that GTRI was not involved in, or even aware of, the work they were doing.

27. Defendant ACREE and his co-conspirators used defendant ACREE'S former employer, Tec-Masters, as a billing pass-through on these consulting jobs for Picatinny Arsenal, SRA International, and the U.S. Air Force. Tec-Masters is a defense contractor located in Huntsville, Alabama. Tec-Masters performed no

labor on any of these consulting jobs but facilitated the transfer of money from the customers to defendant ACREE and his co-conspirators. Tec-Masters was used as a pass-thru to conceal this work from GTRI and to conceal from the United States the fact that GTRI was not conducting the work.

28. In competing for, performing, and billing for the outside consulting work described in this Criminal Information, defendant ACREE and his co-conspirators:

    a. violated Georgia Tech's conflict-of-interest policy and code of business conduct;

    b. diverted customers and revenue away from Georgia Tech for their own personal gain and benefit;

    c. used Georgia Tech facilities and equipment for their own personal gain and benefit;

    d. used and caused others to use interstate wire communications, including email and electronic funds transfers; and

    e. caused checks and documents to be delivered by U.S. mail and by FedEx.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE PROVISION

29. Upon conviction of the offense alleged in this Criminal Information, defendant ACREE shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property constituting or derived from proceeds obtained directly or indirectly as a result of said violation(s), including, but not limited to, a money judgment, that is, a sum of money in United States currency representing the total amount of money involved in each offense for which the defendant is convicted. If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable.

30. If any of the above described forfeitable property, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

JOHN A. HORN
*United States Attorney*

*/s/ J. Russell Phillips*
J. RUSSELL PHILLIPS
*Assistant United States Attorney*
Georgia Bar No. 576335

*/s/ S.H. McClain by JRP w/permission*
STEPHEN H. MCCLAIN
*Assistant United States Attorney*
Georgia Bar No. 143186

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303